**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MARKETING AND MANAGEMENT
INFORMATION, INCORPORATED,
Plaintiff-Appellant,

v.

U.S. DEPARTMENT OF DEFENSE,
William Perry, Secretary; U.S.

No. 96-2601

DEFENSE COMMISSARY AGENCY,
Defendants-Appellees,

A. C. NIELSEN COMPANY;
INFORMATION RESOURCES,
INCORPORATED,
Intervenors-Appellees.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-96-1309-A)

Argued: June 5, 1997

Decided: July 21, 1997

Before WILKINSON, Chief Judge, and LUTTIG and
WILLIAMS, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Alan Mark Grayson, LAW OFFICES OF ALAN M.
GRAYSON, McLean, Virginia, for Appellant. Joseph Philip

Hornyak, SONNENSCHEIN, NATH & ROSENTHAL, Washington, D.C.; William W. Goodrich, Jr., ARENT, FOX, KINTNER, PLOT-KIN & KAHN, Washington, D.C., for Appellees. **ON BRIEF:** James S. DelSordo, LAW OFFICES OF ALAN M. GRAYSON, McLean, Virginia, for Appellant. Helen F. Fahey, United States Attorney, James E. Macklin, Special Assistant United States Attorney, Alexandria, Virginia, for Appellees Department of Defense and Defense Commissary Agency.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Plaintiff-appellant Marketing and Management Information, Inc. ("MMI") appeals from the district court's grant of summary judgment in favor of Defendants-appellees, the United States Department of Defense ("DOD") and the Defense Commissary Agency ("DeCA"), in this federal contracting case. We affirm.

I.

DeCA, the operator of military grocery stores, records sales data from each of its grocery stores by use of point-of-sale scanners. DeCA then sells this data to information companies, such as Intervenors A.C. Nielsen Co. ("Nielsen") and Information Resources Inc. ("IRI"), and MMI, who, in turn, process the data and resell it to manufacturers and distributors of grocery products. Until recently, DeCA sold this data exclusively to MMI.

On February 23, 1996, the General Services Board of Contract Appeals ("GSBCA") invalidated DeCA's award of an exclusive contract to MMI; MMI's appeal of this decision is currently pending before the United States Court of Appeals for the Federal Circuit. In

2

response to the GSBCA ruling, DeCA announced it would begin awarding contracts for the data on a non-exclusive basis and, in a series of letters and other documents, began outlining a mechanism by which the contracts for the data could be sold.

DeCA's announcement of its intent to sell the data on a non-exclusive basis appeared first in identical letters, dated May 8 and May 15, 1996, sent from DeCA to would-be purchasers of the data. In these letters, DeCA announced that it would be selling non-exclusive licenses to the data, emphasizing that "[t]he interest [to be] acquired [by the purchasers of the data] [would] be a license to the data[ ] [and would] be non-exclusive." J.A. at 10, 12, 19. DeCA further explained that, in order to determine the price at which the data would be sold, it would "conduct a spot bid sale" for the "non-exclusive licenses," and that the "highest price received" in the spot bid sale would "constitute the price at which the data [would] be sold to all parties who wish[ed] to buy it." Id. Finally, DeCA stated that one "of the terms of the license[s] to be sold" was that the "[r]aw data [would] be provided on a monthly basis after payment [had been] received." Id. (emphasis added).

On May 23, 1996, following the spot bid sale at which the price of the data was determined, DeCA issued another letter further outlining the manner in which interested parties could obtain the data. That letter disclosed that, pursuant to the spot bid sale, "the price of the data, per month, [would] be $30,000," J.A. at 62. In addition, the letter instructed "[a]ll parties wishing to subscribe for this data . . . to complete a one-time application for the license agreement[,] a copy of . . . [which would] be provided upon written notification of the [party's] interest in this data." J.A. at 63.

Three parties -- MMI, Nielsen, and IRI -- obtained and filed these applications, which further explained, consistent with the May 23 letter, how a party could obtain a "subscription" for the data. Thus, in pertinent part, the applications obtained by MMI, Nielsen, and IRI, all of which were identical, provided that,

> [p]ayment . . . must be received at (by) the Defense Commissary Agency . . . before the Data will be provided. Beginning June 1996, if payment is not received by the 25th

3

> day of the month (or the next business day) following the month for which the data is to be provided, the subscription shall be considered cancelled.

J.A. at 64, 68, 74 (emphasis added). MMI obtained and filed its application on May 23, 1996, and, as a result, immediately began receiving the April and subsequent data; IRI and Nielsen, however, waited until July 16, 1996, and August 16, 1996, respectively, to file their applications, but then were permitted by DeCA to purchase the data from earlier months, including April, retroactively. See J.A. at 68, 74.

Thereafter, MMI brought this suit, challenging both DeCA's sale of any subscription at all to Nielsen and IRI, and, in addition, DeCA's sale of data retroactively, urging that DeCA be enjoined from selling any data to Nielsen and IRI. According to MMI, under the "terms" set forth in the May letters and applications for the licensing agreements, DeCA could not sell any data to any party who failed to apply for such subscription by June 25, 1996; and, claims MMI, DeCA was likewise barred from selling any data retroactively.

In an oral ruling, the district court rejected these arguments, and granted summary judgment in favor of DeCA and DOD. We affirm.

II.

Nothing in either the applications for licensing agreements or the May letters precluded DeCA from selling subscriptions to IRI and Nielsen after June 25, 1996, or from selling data to IRI and Nielsen retroactively.

Contrary to MMI's argument, the applications for licensing agreements do not prohibit DeCA from selling data subscriptions to Nielsen and IRI because Nielsen and IRI waited until after June 25, 1996 to file their applications. In the licensing agreement applications, DeCA merely announced that, as of June 25, 1996, it would make the data available on a subscription basis, and outlined the procedure to be followed should a party wish to purchase and maintain such a subscription. Thus, through the application, DeCA indicated that, "[b]eginning in June" of 1996, when the data would first become

4

available to interested parties, those parties wishing to purchase the data through a subscription would be required to make payment "by the 25th day of the month (or the next business day) following the month for which the data is to be provided," else the "subscription" would be "cancelled." The "beginning in June" language has no substantive content beyond announcing the point at which subscriptions would become available; it does not, as MMI would have us believe, require that all would-be purchasers purchase a subscription by June 25, 1996, else be forever barred from purchasing any of the data.

Likewise, nothing in either the applications or the letters precludes DeCA from selling the data retroactively. Nothing in the application even purports to speak to the issue of the retroactive availability of data. And the letters simply explain that the data would be "provided," i.e., made available, on a monthly basis, and that DeCA would not accept payment on credit, but only "after payment [had been] received"; like the applications, the letters say absolutely nothing about whether the data can be sold retroactively.

That neither the applications nor the letters, by terms, foreclosed DeCA from engaging in the challenged transactions or were intended to do so is confirmed by the public correspondence that took place among the parties before any party entered into any agreement to purchase the data. Indeed, on May 17, 1996, in response to questions posed by MMI itself, DeCA confirmed both that a party could purchase a subscription subsequent to June 25, 1996, and that a party could purchase data retroactively. Thus, in response to MMI's question as to whether "a company [could] decide not to meet the high bid and stay out and then at a later date start buying the data," J.A. at 55, DeCA responded:

> Yes, a firm may decide not to meet the high bid and stay out of the license process, then subsequently start buying the data[,]

J.A. at 56; and, in response to MMI's question as to whether "that company [could] buy the data retroactively," J.A. at 55, DeCA responded:

> Yes, it is expected at this time that such a firm would be able to buy the data retroactively[,]

5

J.A. at 56. This understanding is re-enforced by an earlier letter, dated May 15, 1996, from DeCA to all potential purchasers answering questions submitted to DeCA by those purchasers, wherein DeCA wrote:

> 13Q. Must a contractor agree to purchase the data for each month of the period of availability, or may each contractor decide before receiving the data for any month to pay and receive the data for that month? If each contractor may decide before receiving the data for any month not to purchase the data for this month, may it elect to purchase it in subsequent months?
>
> 13R. As long as the firm is willing to meet the competitively established price for a month's worth of data they can have a license to use that month's data under the terms and conditions specified in the May 8, 1996 letter.

J.A. at 33.

Accordingly, because, nothing in either the license applications or the May letters foreclosed DeCA from allowing IRI and Nielsen to purchase subscriptions after June 25, 1996, or from selling them data retroactively, we affirm the district court's grant of summary judgment in favor of DeCA and DOD.

<u>AFFIRMED</u>

6